IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| MICHAEL KLEINMAN, | § § § | |
| Plaintiff, | § § | |
| v. | § § | 1:15-cv-497-RP |
| CITY OF AUSTIN, | § § | |
| Defendant. | § § | |

# ORDER

Before the Court in the above-styled action are Defendant City of Austin's Motion for Summary Judgment, (Dkt. 56), and Plaintiff Michael Kleinman's Amended Motion for Partial Summary Judgment. (Dkt. 57). Having reviewed the parties' filings, the factual record, and the relevant law, the Court issues the following order.

## BACKGROUND

This case concerns alleged violations of the Clean Water Act ("CWA"), stemming from a construction project completed by the Defendant City of Austin ("the City"). The aim of this construction project was to make certain improvements to Roy G. Guerrero Colorado River Park, including work on the Country Club Creek By-Pass Channel ("the channel"). The City constructed the channel in the late 1970s to prevent the flooding of planned development along Riverside Drive. The channel has suffered erosion since its creation, and continues to erode. The City's construction project was directed in part at that erosion, but it also involved other improvements, such as the construction of pedestrian trails.

Plaintiff Michael Kleinman resides across the Colorado River from the point where the channel meets the river. He alleges that the City failed to take necessary steps to prevent erosion during construction, which resulted in fill dirt, sand, gravel, rocks, and other material flowing into

the river during heavy rainfalls, and continues to result in such emissions. According to Plaintiff, these emissions, allegedly in violation of the CWA, have caused the formation of a sediment bar in the river at the mouth of the channel. This sediment bar is visible from Plaintiff's residence and his business, both of which are located directly across the river from the channel.

Plaintiff filed this lawsuit on June 11, 2015. He seeks an injunction requiring the City to take remedial measures to remove the sediment bar and to prevent further discharge of construction material into the Colorado River. The parties filed their respective motions for summary judgment on May 1, 2017. Plaintiff asserts that the City has all but conceded liability under the CWA. The City, on the other hand, contends that Plaintiff lacks standing to sue under Article III and the CWA, and that it is immune from liability under the CWA because of permits it held at the relevant time. The Court sought additional briefing on June 8, 2017, which the parties submitted on July 26, 2017. The motions are ripe for review.

## LEGAL STANDARD

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure only "if the movant shows there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986). "A fact issue is 'material' if its resolution could affect the outcome of the action." *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012).

The party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[T]he moving party may [also] meet its burden by simply pointing to an absence of evidence to support the nonmoving party's case." *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 544

2

(5th Cir. 2005). The burden then shifts to the nonmoving party to establish the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *Wise v. E.I. Dupont de Nemours & Co.*, 58 F.3d 193, 195 (5th Cir. 1995). After the non-movant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the non-movant, summary judgment will be granted. *Miss. River Basin Alliance v. Westphal,* 230 F.3d 170, 175 (5th Cir. 2000). The court will view the summary judgment evidence in the light most favorable to the non-movant. *Rosado v. Deters*, 5 F.3d 119, 123 (5th Cir. 1993).

## DISCUSSION

The Court will first address the City's arguments before turning to Plaintiff's motion for summary judgment.

**1.     The City's Motion for Summary Judgment**

**A.     Article III Standing**

The City first argues that this case should be dismissed because Plaintiff lacks standing to sue under Article III of the United States Constitution. For the reasons that follow, the Court disagrees.

Article III standing is a jurisdictional requirement, without which a federal court may not proceed in a case. *N.A.A.C.P. v. City of Kyle*, 626 F.3d 233, 237 (5th Cir. 2010). In order to establish standing, the plaintiff must demonstrate: (1) that he has suffered or will imminently suffer a concrete and particularized injury to a legally protected interest; (2) that this injury is traceable to the defendant's challenged conduct; and (3) that it is likely that the injury will be redressed by a decision rendered in the plaintiff's favor. *Id.*

Each of these elements is satisfied here. First, Plaintiff has produced an affidavit in which he avers that he purchased his property in part because of the view of the river, that he spends time in the part of his property abutting the river, and that the debris in the river is directly visible from his property and negatively impacts his view. (Kleinman Decl., Dkt. 57-2, at 1). Aesthetic injuries such

3

as these are undoubtedly sufficient to support standing. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 563–64 (1992) ("Of course, the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing.") (citing *Sierra Club v. Morton*, 405 U.S. 747, 734–35 (1972) ("Aesthetic and environmental well-being, like economic well-being, are important ingredients of the quality of life in our society . . . .")). Though the City complains that Plaintiff has shown no additional economic or recreational injury, it has pointed to no authority suggesting that such injuries are necessary in addition to an aesthetic injury.

The City next contends that Plaintiff cannot show that the injury is caused by its activity, more specifically, by emissions of pollutants stemming from its construction project. But there is certainly evidence that runoff from the City's construction project contributes to the accumulation of sediment in the Colorado River. (*See* Allison Decl., Dkt. 57-4, at 4-5; Kelly Dep., Dkt. 56-7, at 14:2-15 (City's expert conceding that construction material was deposited in sediment bar)). Naturally, some of this evidence is disputed: the City contends that the sediment is the result of natural erosion that has been ongoing for decades and is no longer actionable, and even the Plaintiff's experts concede that this natural erosion is a contributing factor to the sandbar. The factfinder may resolve this dispute to the extent such resolution is ultimately necessary, but it suffices for the purposes of standing to note that there is evidence suggesting that the City's actions have at least contributed to Plaintiff's aesthetic injury, even if it is not the sole cause.

The final element of standing is redressability. The City argues that redressability cannot be established because "Kleinman has not asserted any practicable method to remove certain rocks and sand from the River and return such materials to the channel." (Def.'s Mot. Summ. J., Dkt. 56, at 8). The City points to suggestions of Plaintiff and his experts offering hypothetical means of redressing the violation, highlighting that the experts acknowledged the potential for other adverse effects. However, the mere fact that a particular remedy is imperfect does not undermine the redressability

4

component. *See Massachusetts v. E.P.A.*, 549 U.S. 497, 525 (2007) (citing *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982) ("[A] plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his *every* injury.")). A remediation plan that slows the discharge of construction materials into the Colorado River will support the redressability requirement even if the plan does not totally eliminate the sediment bar itself. *See id.* ("While it may be true that regulating motor-vehicle emissions will not by itself *reverse* global warming, it by no means follows that we lack jurisdiction to decide whether EPA has a duty to take steps to *slow* or *reduce* it."). It is likely, not merely speculative, that such a reduction in discharge would result from the relief Plaintiff seeks.

Having considered each element, the Court concludes that Plaintiff has standing to pursue his claims.

### B. Ongoing Violation

The City next argues that Plaintiff cannot maintain a citizen-suit to enforce the CWA because he cannot establish a continuing or intermittent violation.

The CWA does not confer jurisdiction over citizen suits for wholly past violations. *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 57 (1987). Rather, a plaintiff must "allege a state of either continuous or intermittent violation—that is, a reasonable likelihood that a past polluter will continue to pollute in the future." *Id.* This Court has previously concluded that Plaintiff has made a good-faith allegation that Defendants are engaged in a continuing violation. (Order Denying Mot. Dismiss, Dkt. 12, at 5). While such an allegation is sufficient to commence a suit, a defendant may later challenge the plaintiff's factual basis for the allegation, as the City does now. *See id.* at 65–66. The defendant's burden is then to show that "the allegations were sham and raised no genuine issue of fact." *Id.* at 66. (quoting *United States v. SCRAP*, 412 U.S. 669, 689 (1973)). However, where the allegations of non-compliance, while true when the suit was filed, later become

5

false through the defendant's subsequent compliance, *Gwaltney* suggests that the issue falls under the doctrine of mootness. *See id.* In such a situation, the defendant bears a heavy burden to show that the alleged violation "could not reasonably be expected to recur." *Id.* (quoting *United States v. Phosphate Export Ass'n, Inc.*, 393 U.S. 199, 203 (1968)).

Any available affirmative defenses notwithstanding, the available evidence substantiates Plaintiff's allegation that the City was not in compliance with the CWA at the time the suit was filed. The City's expert conceded that material from the construction project was discharging into the Colorado River as late as October 2015—several months after this suit was initiated. (Kelly Dep., Dkt. 45-3, at 12:10-13). There is therefore no question that the case was properly filed to address a continuing violation.

As noted above, however, a true allegation of non-compliance may become false after filing a complaint, making the suit vulnerable to dismissal on grounds of mootness. The question here is a close one. The City's expert contends that all of the construction material that would be discharged into the river has already been discharged. (Kelly Dep., Dkt. 56-7, at 12:10-13). On the other hand, Plaintiff's experts maintain that sand, silt, gravel, and other material continues to accumulate in the sediment bar with each heavy rain. Plaintiff's expert, Barrett Allison, states that he personally observed construction material from the project in the channel on July 2, 2017. (*See* Allison Report, Dkt. 71-1). According to Allison, the material had migrated downstream and, in his opinion, would continue to wash into the river during subsequent rain events. (*See id.*).

There is evidence, therefore, that construction material is likely to continue washing into the river. To the extent the City has contrary evidence, it is appropriate to deny summary judgment and allow the jury to resolve the issue. *See Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006) ("If satisfaction of an essential element of a claim for relief is at issue [in a jurisdictional determination], the jury is the proper trier of contested facts."); *Sierra Club v. Shell Oil Co.*, 817 F.2d 1169, 1171–72

6

(5th Cir. 1987) (holding that issue of ongoing violation of CWA is jurisdictional fact intertwined with the merits of the claim).

### C. Statute of Limitations

The City contends that Plaintiff's claims must fail because he cannot show there has been an actionable discharge within the statute of limitations. The applicable limitations period in this case is five years. 28 U.S.C. § 2462. The basis for the City's contention is that any ongoing discharge is a continuation of the erosion of the channel that has been ongoing since it was built. As stated above, however, the City concedes that construction material has entered the river as late as October 2015, and there is evidence that similar discharges continue. Plaintiff's claims are therefore not barred by the statute of limitations, though any discharges within the last five years may be subject to another defense, as discussed below.

### D. Statutory Exception

The City says its discharges are exempted from liability under the Clean Water Act pursuant to a "maintenance exception." *See* 33 U.S.C. § 1344(f)(1)(B). Under the relevant statute, discharges of "dredged or fill material" "for the purpose of maintenance . . . of currently serviceable structures such as dikes, dams, levees, groins, riprap, breakwaters, and bridge abutments or approaches, and transportation structures," are not prohibited. *Id.*

This statute is not applicable to the facts of this case. First, it is not clear that the discharges complained of here are made up of "fill material," a term defined as material placed in the waters of the United States to either replace any portion of a water of the United States with dry land or to change the bottom elevation of any portion of a water of the United States. 40 C.F.R. § 232.2. The material can include rock, sand, soil, clay, plastics, construction debris, and woodchips, among other things. *Id.* While the definition is broad enough to encompass nearly anything, it is not clear that the material discharged here was at any point intended to replace any part of the channel with land—

7

assuming the channel is properly considered part of the waters of the United States. For example, the definition does not appear to encompass the bridge that washed into the river.

Second, the term "discharge of fill material," as used in the statute, has been defined as "the addition of fill material into the waters of the United States." 33 C.F.R. § 323.2. This includes "[p]lacement of fill that is necessary for the construction of any structure or infrastructure," "bulding of any structure, infrastructure, or impoundment requiring rock, sand, dirt, or other material for its construction," "site-development fills," and other activities related to building structures. *Id.* Regardless of the particular activity, the context of the statute makes clear that it exempts only the placement of material that is *for the purpose* of maintenance. It is not suggested that it encompasses the discharge of pre-existing dirt, sand, silt, or other material *incidental to* the construction. It appears, then, that the maintenance exception covers the intentional placement of material into the waters, perhaps to replace damaged parts of a structure. Accordingly, it might cover the City's initial placement of erosion control structures, such as a riprap, which replaced part of the channel with land. It would not, under this reading, cover the incidental and subsequent discharge of that material into the river, nor would it cover the discharge of materials that were not intended to replace a portion of the channel with land.

Because Plaintiff does not complain of the initial placement of material into the channel, but rather the subsequent discharge of this and other material into the river, the maintenance exception of 33 U.S.C. § 1344(f)(1)(B) does not apply.

**E.     Permit Shield**

The City's final argument is that it is shielded from liability under the Clean Water Act because its construction activity was covered by two permits.

The Clean Water Act generally imposes strict liability for the discharge of pollutants. *Sierra Club v. ICG Hazard, LLC*, 781 F.3d 281, 284 (6th Cir. 2015). The primary exception to the strict

8

liability regime is the permitting process of the National Pollution Discharge Elimination System ("NPDES"), under which states may be empowered to issue permits for the discharge of certain pollutants. *Id.*; 33 U.S.C. § 1342. This gives rise to the so-called "permit shield" defense under 33 U.S.C. § 1342. That statute provides that "[c]ompliance with a permit issued pursuant to [the NPDES] shall be deemed compliance" with the Clean Water Act. 33 U.S.C. § 1342(k). In other words, "[i]f a permit holder discharges pollutants precisely in accordance with the terms of its permit, the permit will 'shield' its holder from CWA liability." *Piney Run Pres. Ass'n v. Cty. Comm'rs of Carroll Cty.*, 268 F.3d 255, 266 (4th Cir. 2001). "The purpose of the shield is 'to insulate permit holders from changes in various regulations during the period of a permit and to relieve them of having to litigate in an enforcement action the question whether their permits are sufficiently strict.'" *Sierra Club*, 781 F.3d at 285 (quoting *E.I. du Pont de Nemours & Co. v. Train*, 430 U.S. 112, 138 n.28 (1977)).

### i. Municipal Separate Storm Sewer System Permit

One permit the City relies on is Texas Pollution Discharge Elimination System ("TPDES") Permit No. WQ0004705000, which authorizes the City's discharges from its Municipal Separate Storm Sewer System ("MS4"). (MS4 Permit, Dkt. 56-12, at 2). However, this permit does not cover the construction activity at issue here. Rather, it appears that storm water discharges from construction sites are expressly excluded from the scope of the permit. (*See id.* at 2). The permit provides that is does not authorize any storm water discharges associated with industrial activity or other storm water discharges required by the TCEQ to obtain a TPDES permit. (*Id.*). Looking at the relevant general permit for construction, under which the City operated, permit coverage is clearly required for its construction activity. (General Permit, Dkt. 56-8, at 3). The construction discharges therefore would not fall within the scope of the sewer system permit. (*See* MS4 Permit, Dkt. 56-12, at 2).

9

The second problem with the City's reliance on the sewer permit is one of compliance. The permit required that the City implement a comprehensive plan to reduce "erosion and the discharge of pollutants in storm water from areas of redevelopment." (*Id.* at 3). The City's alleged failure to implement a plan to reduce the erosion in Guerrero Park—an area of redevelopment—is precisely what is at issue in this case. A question therefore exists whether, even assuming the sewer permit applies, the City complied with the terms of that permit requiring action to control erosion following construction activity.

### ii. Storm Water Construction General Permit

The second permit, referenced above, is the Storm Water Construction General Permit, TXR 150000. (Dkt. 56-8). To operate under this general permit, the City, through its contractor Austin Filter Systems Inc., was required to file a Notice of Intent, which it did. (*See* Notice of Intent, Dkt. 56-9). The general permit requires the permittee to implement "certain storm water pollution prevention and control measures," including the implementation of "storm water pollution prevention plan (SWP3) that is tailored" to the construction site. (*Id.*). "As a facility authorized to discharge under the [general permit]," the City was required to comply with "all terms and conditions" in order to "maintain coverage and avoid possible penalties." (*Id.*). The City became authorized to operate under the general permit as of October 14, 2009, and its authorization expired on March 5, 2013, at the latest. (*Id.*). While the general permit was renewed in March 2013, there is no indication that the City filed a Notice of Intent to maintain coverage for any further activities.

This permit, like the prior one, does not clearly prevent the City's liability. Most fundamentally, the permit expressly provides that it does not cover discharges that occur after construction activities have been completed—in this case, at some point in 2012. (General Permit, Dkt. 56-8, at 11). Additionally, the City had no authorization to discharge pollutants under the general permit after March 5, 2013. (*See* Notice of Intent, Dkt. 56-9). Yet even the City concedes

10

that material from its construction project continued to enter the river as late as October 2015. (Kelly Dep., Dkt. 45-3, at 12:10-13). And the permit obviously would not cover discharges that continue to occur.

With respect to the discharges that Plaintiff alleges continue after the expiration of the permit, the City doubles down on its argument that this cannot constitute an ongoing discharge. "It defies logic," the City argues, "to assert an 'ongoing' unlawful act if the original act—construction activity to maintain the bypass channel—was lawful." (Def.'s Reply, Dkt. 61, at 5). On the contrary, it defies logic that a permit that explicitly excludes post-construction discharges would nonetheless confer perpetual protection for the discharges it initially authorized. The City cites no support for this argument. In any case, Plaintiff disputes whether the City complied with its permit, which would rob the city of permit-shield protection in the first instance. (*See* Allison Decl., Dkt. 57-4, at 5).

The City makes two further suggestions in its supplemental briefing. First, it suggests that the construction permit might still apply because the general construction permit was renewed after its March 5, 2013, expiration. However, as noted above, coverage under the general permit expired when final stabilization of the site had taken place, and coverage thereafter would not be automatic—it would instead require a further notice of intent.[1] Second, the City suggests that all discharges following the expiration of its construction permit fall within the scope of its MS4 permit. The Court does not construe the coverage of the MS4 so broadly. Doing so would defeat the object of the general permit's requiring discharge prevention plans for discharges *into* MS4s. (*See* General Permit, Dkt. 56-8, at 24). Additionally, where the MS4 permit expressly excludes from its scope discharges requiring a separate permit, it makes little sense to conclude that these same discharges fall within the MS4s scope simply because the separate permit expired.

---

[1] The construction permit required that a "notice of termination" of the authorization to be filed within thirty days of the final stabilization. (General Permit, Dkt. 56-8, at 19).

11

In sum, the City's permits do not shield it from liability for the ongoing discharge from the construction site. Since the permit shield was the City's final defense, its motion for summary judgment must be denied.

2.  **Plaintiff's Motion for Summary Judgment**

Having determined that fact disputes preclude application of the City's defenses on summary judgment, the Court next turns to whether Plaintiff's evidence otherwise establishes liability under the CWA.

The CWA prohibits "the discharge of any pollutant" except in compliance with the CWA's requirements. 33 U.S.C. § 1311(a). The term "discharge of a pollutant" is defined as "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). Thus, Plaintiff must establish that the City (1) is discharging (2) a pollutant (3) into navigable waters (4) from a point source (5) not in compliance the CWA.

Elements three and four appear to be uncontested. There is no dispute that the Colorado River is a navigable stream of the United States. Additionally, a channel can undoubtedly be a point source. 33 U.S.C. § 1362(14) ("The term 'point source' means any discernible, confined, and discrete conveyance, including . . . any . . . channel . . . ."). The remaining elements are disputed to varying degrees depending on the type of pollutant at issue, two of which are of concern here. The first is the material from the construction project. The second is the dirt, sand, gravel, and biological material (such as trees) that are being washed into the channel due to erosion.

As to the first type, the City does not contend that the material is not a pollutant. However, it asserts that there is no ongoing discharge of the construction material and that any discharges are authorized by permits. The Court has previously made note of Plaintiff's evidence that discharge of this material is indeed ongoing, which conflicts with the opinion of the City's expert that no further construction material is likely to be discharged. (Supplemental Kelly Aff., Dkt. 72-1, ¶ 8).

Additionally, as discussed in detail above, the City's construction permit does not cover any ongoing discharges, and fact disputes concerning the City's compliance with its MS4 permit prevents its application on summary judgment to the extent it provides any protection at all. Because the parties have provided conflicting evidence as to whether the discharge of construction materials is ongoing, summary judgment is inappropriate.

The next class of materials includes sand, dirt, gravel, and other items that are being discharged from the channel due to erosion. Unlike with the construction materials, there is no dispute that this matter continues to flow into the river. Nonetheless, the City contends that the material is not a pollutant under the CWA and that the erosion was not caused by its conduct. The CWA, however, includes these sorts of materials within its definition of "pollutant." *See* 33 U.S.C. § 1362(6) (listing rock, sand, and other materials as pollutants).

The second question—whether the discharge of the material is traceable to the City's conduct—is more complicated. In *Sierra Club v. Abston Construction Co., Inc.*, the Fifth Circuit found that "[s]imple erosion over the material surface, resulting in the discharge of water and other materials into navigable waters, does not constitute a point source discharge, absent some effort to change the surface, to direct the waterflow or otherwise impede its progress." In this case, the City's construction project undeniably altered the surface so as to direct the waterflow in the channel. A dispute exists, however, over whether the City's activities caused the discharge of materials, or merely failed to stop an inevitable and naturally occurring phenomenon.[2] Plaintiff's expert contends that the City's construction activities "dramatically increased the erosion and altered the channels." (Allison Report, Dkt. 71-1, ¶ 6). On the other hand, the City's expert maintains that the construction

---

[2] The City states that the erosion has been ongoing since the construction of the channel decades ago, conceding that the initial construction was the cause of the erosion. Plaintiff raises a substantial argument that the continued erosion represents an ongoing violation that remains actionable, but the Court agrees with Defendant that Plaintiff's pleadings are limited to only the erosion resulting from the more recent construction project.

13

project merely failed to arrest an ongoing process of erosion, and that the City's activities "did not cause an increase in the rate of erosion." (Supplemental Kelly Aff., Dkt. 72-1, ¶ 4). He suggests instead that the substantial erosion evident in the photographs he attached to his affidavit was the result of storm events of particular magnitude. (*Id.*).

Resolution of these fact disputes critical to the issue of the City's liability must be left to the factfinder. Plaintiff's motion must therefore be denied.

## CONCLUSION

For the foregoing reasons, the Court **DENIES** Plaintiff's Amended Motion for Partial Summary Judgment, (Dkt. 57), and **DENIES** the City of Austin's Motion for Summary Judgment. (Dkt. 56).

**SIGNED** on August 18, 2017.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE