IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| MICHAEL KLEINMAN, | § § § | |
| Plaintiff, | § § | |
| v. | § § | 1:15-cv-497-RP |
| CITY OF AUSTIN, | § § | |
| Defendant. | § § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

On September 20 and 21, 2017, the Court held a non-jury trial in this case. During the trial, the Court took evidence and heard sworn testimony. On November 20, 2017, Plaintiff submitted his proposed findings of fact and conclusions of law. (Dkt. 105). On November 22, 2017, Defendant submitted its proposed findings of fact and conclusions of law. (Dkt. 106). Having considered the evidence, testimony and oral argument presented during the trial, the post-trial submissions, and the applicable law, the Court now enters the following findings of fact and conclusions of law. Any finding of fact that should be construed as a conclusion of law is so adopted. Any conclusion of law that should be construed as a finding of fact is so adopted.

## I. INTRODUCTION

Michael Kleinman ("Kleinman") has sued the City of Austin ("the City") for violations of the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq*. Those violations stem from ongoing discharges of sand, soil, rock, and other sediment that are being washed into the Colorado River from the bed and banks of a channel running through a city park.

Kleinman also alleges that construction materials from the City's work on that channel are being discharged into the river, but the evidence suggests that those discharges have ceased. Nonetheless, sediment is a pollutant under the CWA, and there is no question that sediment from the channel continues to be washed into the river during even minor rain events.

The Court therefore agrees with Kleinman that the City's discharges of sediment violate the CWA. The finding of a violation, however, does not end the inquiry, for the Court must also fashion a remedy. The Court finds that the evidence does not justify the injunction the Kleinman requests; a nominal civil penalty will do.

## II. FINDINGS OF FACT

The Court finds the following facts. The Colorado River is a navigable body of water of the United States that passes through Austin, Texas. Roy G. Guerrero Colorado River Park borders a stretch of the river in southeast Austin. Country Club Creek West runs through the park and empties into the river. The Country Club Creek Bypass Channel (the "Channel") extends from a bend in the creek to a discharge point across the river from Kleinman's backyard.

The Channel originally existed as a natural gully that brought water to the river from a different manmade channel that did not extend to the river. In the late 1970s, before the City owned the land on which the park now sits, a private developer dug a channel to divert water away from land slated for residential development. The developer's channel stopped about 1,000 feet short of the river. The developer's channel also stopped at an elevation 20 feet above the river. Water running through the developer's channel therefore found its own way to the river.

For the most part, water from the developer's channel found its way to the river along a dominant flow path to the east of the channel's endpoint. This dominant path became County Club Creek West. But water would overflow the creek's banks during large rain events, forming a natural gully heading due north to a point across the river from what is now Kleinman's property.

As it happens, the soil underneath much of the park is sand and other fine sediment deposited by the Colorado River over hundreds of years at a slow-moving bend in the river. The natural gully traced its path to the river through this sandy soil. Due to the elevation at which the

2

developer's channel abruptly ended, the natural gully's path through the sandy soil had a slope of 2 percent.

A stable slope through sandy soil is about 0.25 percent. The gully's path was therefore an unstable one; water moving through that soil naturally eroded the gully as it sought its longer, more gradual, and more stable form. Had the City done nothing, natural erosion would have continued until the gully reached its stable slope of 0.25 percent which, accounting for the 20-foot drop to the river, would extend 8,000 feet inland. Naturally occurring erosion had already deposited enough sediment into the Colorado River to form a visible sandbar at the gully's delta as early as 1997, long before the City began work on the Channel. Left unchecked, natural erosion would have continued to deposit considerable amounts of sediment into the river.

After the City acquired the land now constituting Roy G. Guerrero Park, it recognized that the gully posed an erosion problem and secured funding to improve the gully. In 2010, the City began construction of the Channel along the footprint of the gully in order to reduce erosion and define the contours of the gully. To construct the Channel, the City excavated dirt and sand to shape the Channel, filled in the top of the Channel bed with less erosive material, covered the Channel bed with erosion-control fabric, and installed rock berms. The City used temporary erosion controls during the construction period. The City also built a pedestrian footbridge that spanned the Channel about 1,000 feet upstream of the river. The City completed its work on the Channel and the pedestrian bridge in 2012.

The City's construction project failed to arrest the erosion problem. The Channel bed is now at least 10 to 12 feet lower than it was when construction began. The Channel's headcut—a highly erosive elevation drop at which fast-moving water scours out soil—is moving inland by hundreds of feet every year. City expert Mike Kelly[1] admits that it is "extremely unusual" for a headcut to move

---

[1] Mr. Kelly is the managing engineer of the City's Watershed Protection Department.

3

upstream so rapidly. (Tr., Dkt. 104, at 68:23–25). City engineer Janna Renfro characterized this rate of headcut progression as "completely off the charts."[2] (Renfro Presentation, Dkt. 102-9, at 8:20 (Pl.'s Ex. P-25)). Even minor rain events of one to two inches are now moving the headcut 30 or 50 feet upstream—rates of progression that would be considered fast over a full year. (*Id.* at 8:30–9:00).

The headcutting is ongoing. As the headcut continues to move, the Channel continues to erode, depositing sediment from the Channel into the river at the point where the two meet. At that point there exists a visible sandbar, the present shape and constitution of which is attributable at least in part to the City's construction of the Channel and the ongoing erosion stemming from that project.

Kleinman lives directly across the river from the mouth of the Channel. From his backyard, which abuts the river's northern bank, he can see the sandbar that lies across the river at the mouth of the Channel. Kleinman dislikes the sandbar. He says the sight of the sandbar makes it "very frustrating" to go out to his backyard and that seeing the sandbar makes it less enjoyable for him to use his decks or swim in the river. (Tr., Dkt. 103, at 31:11–23).

The City has a plan to address the ongoing Channel erosion. The City will soon construct three concrete drop structures that will step the Channel down to the river. The drop structures will control headcutting and erosion by creating discrete points of elevation change that use concrete stilling basins to reduce the water's energy before sending it downstream along a stable slope. The project will cost about $12.5 million and completion is expected in 2020.

---

[2] To put the Channel's headcut progression in perspective, Renfro states that fast movement for a headcut is typically 10 to 20 feet in a year. (Renfro Presentation, Dkt. 102-9, at 8:30 (Pl.'s Ex. P-25)). The 1200 feet of headcut progression between May 2015 and late 2016 is "orders of magnitude" greater than what is typically regarded as fast progression. (*Id.* at 8:35).

# III. CONCLUSIONS OF LAW

*A. Standing*

Kleinman has standing to maintain this action. In order to establish standing, a plaintiff must demonstrate that: (1) he has suffered a concrete and particularized injury in fact that is actual or imminent; (2) the injury is fairly traceable to the defendant's challenged conduct; and (3) it is likely the injury will be redressed by a decision rendered in the plaintiff's favor. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000). Kleinman has met his burden as to each requirement.

First, Kleinman has suffered an injury in fact. Aesthetic and recreational injuries constitute injuries in fact for CWA citizen-suit plaintiffs. *Id.* at 183 (explaining that, in a CWA citizen suit, "environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity") (citation and quotation marks omitted). Kleinman testified that he is frustrated by the sight from his backyard of the sandbar formed by sediment discharged from the Channel. (Tr., Dkt. 103, at 31:11–17). Kleinman also testified that the sight of the sandbar diminishes the enjoyment he takes from swimming in the river behind his property and from using his riverside decks. (*Id.* at 31:18–32:2). Kleinman's testimony establishes that he has suffered aesthetic and recreational injuries sufficient to constitute an injury in fact.

Second, Kleiman's injury is fairly traceable to the City's conduct. To establish that an injury is fairly traceable to a defendant's discharges, a CWA plaintiff must demonstrate that "a defendant has (1) discharged some pollutant in concentrations greater than allowed by its permit (2) into a waterway in which the plaintiff[ ] ha[s] an interest that is or may be adversely affected by the pollutant and that (3) the pollutant causes or contributes to the kinds of injuries alleged by the plaintiff[ ]." *Friends of the Earth, Inc. v. Crown Cent. Petroleum Corp.*, 95 F.3d 358, 360–61 (5th Cir. 1996)

(citation and quotation marks omitted). Proving traceability "does not require that the plaintiffs show to a scientific certainty that . . . [the] defendant's [discharge] alone caused the precise harm suffered by the plaintiffs." *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co. Inc.*, 73 F.3d 546, 558 (5th Cir. 1996).

Kleinman has shown that the City discharged sediment not authorized by a permit—as the Court will later discuss in more detail—into a river in which Kleinman has aesthetic and recreational interests. The discharged sediment ends up in the sandbar, which causes Kleinman's aesthetic and recreational injuries. Kleinman's injuries in fact are thus fairly traceable to the City's discharges of sediment.

The City's main objection to Kleinman's standing is that his injuries are not traceable to the City's conduct because the "primary causes of sandbar formation" are headcutting caused by the 1976 channel design, the loose sandy soil underneath the Channel, and two major floods in 2015. (Def.'s Prop. Find. Fact and Concl. of Law, Dkt. 106, at 11–12). Even if the City's position regarding the primary causes of the sandbar's formation were correct, Kleinman still has standing. Kleinman need not prove to a scientific certainty that the City's conduct alone caused his injuries; he need only establish that that the City's conduct contributed to his injuries. *Cedar Point Oil*, 73 F.3d at 558. At the very least, the City's failure to construct the Channel in a way that arrested erosion has contributed to the continued existence and size of the sandbar. Kleinman's injuries are therefore fairly traceable to the City's conduct even if his injuries can also be traced to other causal mechanisms.

Finally, Kleinman's injuries are redressable by a favorable decision. A plaintiff satisfies the redressability requirement by seeking a remedy that will at least provide some relief for his or her injuries, even if that relief is imperfect. *See Massachusetts v. E.P.A.*, 549 U.S. 497, 525 (2007) (citing *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982) ("[A] plaintiff satisfies the redressability

6

requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his *every* injury.")). Kleinman has requested relief that would reduce the discharges that are causing his injuries in fact; he has therefore satisfied this requirement.

*B. Liability*

The CWA makes it unlawful to discharge pollutants except in compliance with certain provisions of the CWA. 33 U.S.C. § 1311(a). The CWA defines "discharge of a pollutant" as the "addition of any pollutant to navigable waters from any point source." *Id.* § 1362(12). Sand and sediment are pollutants under the CWA. 33 U.S.C. § 1362(6) (listing rock, sand, and other materials as pollutants). The CWA imposes strict liability for unauthorized discharges of pollutants under Section 1311(a). *See United States v. Citgo Petroleum Corp.*, 697 F. Supp. 2d 670, 672 (W.D. La. 2010) ("[T]he [Clean Water] act imposes strict liability.") (citing *United States v. Coastal States Crude Gathering Co.,* 643 F.2d 1125, 1127 (5th Cir. 1981)). The CWA does not confer jurisdiction over citizen suits for violations that took place wholly in the past. *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 57 (1987). Rather, a citizen-suit plaintiff must "allege a state of either continuous or intermittent violation—that is, a reasonable likelihood that a past polluter will continue to pollute in the future." *Id.*

The parties have stipulated that the Colorado River is a navigable water of the United States and that the Channel is a point source. The sediment eroding from the Channel into the river is a pollutant. There is ample evidence from the City's own engineers that substantial erosion in the Channel continues, and the City does not dispute that sediment continues to be discharged from the Channel.[3] These facts establish an ongoing violation of Section 1311(a) of the CWA. The City only

---

[3] The City's post-trial briefing states that no construction materials continue to be discharged, but says nothing about the sediment eroding into the Colorado River. (Def.'s Prop. Find. Fact and Concl. of Law, Dkt. 106, at 12). In his closing remarks, counsel for the City characterized the eroding sediment as an "ongoing discharge" as he disputed the City's causal responsibility for the discharge. (Tr., Dkt. 104, at 104:21–23).

7

raises two arguments in defense of the ongoing sedimentary discharges: that the City did not cause them and that they are covered by a permit. The Court has already addressed the first of these arguments.

As for the second—the City's permit defense—it is true that the CWA exempts from liability any discharges that comply with 33 U.S.C. § 1342 ("Section 1342"). 33 U.S.C. § 1311(a). Section 1342 establishes the National Pollutant Discharge Elimination System ("NPDES"), which authorizes states to issue permits for the discharge of pollutants. 33 U.S.C. § 1342(b). Compliance with a state-issued NPDES permit constitutes compliance with Section 1311(a) of the CWA. 33 U.S.C. § 1342(k).

The City is authorized to discharge storm water and pollutants from the Municipal Storm Sewer System ("MS4") under a permit (the "MS4 permit") issued by the Texas Commission on Environmental Quality.[4] The Channel is part of the MS4. The City asserts that its discharges from the Channel are covered by its MS4 permit and that its discharges comply with that permit.[5] The Court disagrees.

The City's position is that any Channel discharges comply with its MS4 permit because the permit only requires the City to "adopt minimum control measures to reduce erosion to the maximum extent practicable." (Def.'s Prop. Find. Fact and Concl. of Law, Dkt. 106, ¶ 7; Tr., Dkt. 104, at 103:18–22). The City also interprets the MS4 permit to excuse discharges caused by "acts of God" such as the 2015 floods. (Def.'s Prop. Find. Fact and Concl. of Law, Dkt. 106, ¶ 7). Neither position is correct.

---

[4] The City's MS4 permit was issued as Texas Pollutant Discharge Elimination System Permit No. WQ0004705000 and has been active for at all times relevant to this action. (MS4 Permit, Dkt. 102-3, at 112 (Def.'s Ex. 5 at COA1253)).

[5] At earlier stages of this litigation, the City also argued that its discharges were covered by its general permit for large construction activities. (Def.'s Mot. Summ. J., Dkt. 56, at 12–14). The Court declined to grant summary judgment under that permit, (Order, Dkt. 74, at 10–12), and the City abandoned its defense under that permit at trial. (*See* Def.'s Prop. Find. Fact and Concl. of Law, Dkt. 106, at 12–13 (asserting a permit-shield defense under only the MS4 permit)).

The MS4 permit requires the City to develop and implement a Storm Water Management Plan ("SWMP"). (MS4 Permit, Dkt. 102-3, at 113 (Def.'s Ex. 5 at COA1254)). The MS4 then requires the SWMP to "include controls necessary to . . . reduce the discharge of pollutants from the MS4 to the maximum extent practicable." (*Id.*; *see also id.* at 114 (Def.'s Ex. 5 at COA1255 (requiring that the SWMP contain minimum control measures to reduce erosion and the discharge of pollutants to the maximum extent practicable))). This requirement applies to how the City designs its SWMP but does not support the conclusion that the City complies with the MS4 so long as it reduces erosion or controls pollutant discharges to the maximum extent practicable. More is required.

Indeed, Mr. Kelly—the City's own expert—testified that to comply with the MS4, the City must comply not only with the SWMP but also with the City's own rules and ordinances. (Tr., Dkt. 104, at 79:3–10). One set of applicable City rules is the City's Environmental Criteria Manual ("ECM"), which is part of the City's implementation of its SWMP. (Tr., Dkt. 103, at 152:5–8). The ECM announces a policy to "[m]inimize the erosion and transport of soil . . . [p]revent sedimentation in . . . waterways . . . [and] [m]inimize flooding hazards . . . associated with excessive sediment accumulation in . . . waterways." (ECM Excerpts, Dkt. 102-1, at 58 (Pl.'s Ex. 14, at P-14)). The ECM requires the City to retrieve sediment carried offsite from construction sites after rain events and prohibits "[t]he release of excessive amounts of sediment in storm water runoff." (*Id.*). The substantial ongoing erosion of sediment resulting from the City's construction of the Channel does not comply with these requirements and thus takes the City out of compliance with its MS4 permit.

Mr. Kelly also testified that compliance with the MS4 permit requires the City to maintain its improvements to the MS4 and the permanent erosion controls it installs. (Tr., Dkt. 104, at 78:24–79:2, 79:11–18). City expert Mark Schruben, the project manager in charge of the Channel's

9

construction, testified that the City installed rock berms in the Channel that were intended to be permanent erosion control measures. (Tr., Dkt. 103, at 205:25–206:2). Those rock berms were washed away and never replaced. (*Id.* at 206:3–6). Based on the testimony of the City's own experts, the failure to maintain these permanent erosion controls takes the City out of compliance with its MS4 permit.

As for the City's "act of God" argument, the City's attempt to attribute the ongoing erosion to the 2015 floods fails to bring the City into compliance with its MS4 permit. The MS4 permit allows the City to assert the *force majeure* defense provided for by the Texas Administrative Code. Tex. Admin. Code § 70.7(a) ("If a person can establish that an event that would otherwise be a violation of a statute, rule, order, or permit was caused *solely* by an act of God, war, strike, riot, or other catastrophe, the event is not a violation of that statute, rule, order, or permit.") (emphasis added). Even assuming that (1) the City did not waive this affirmative defense by failing to raise it until trial and (2) the 2015 floods are "acts of God" under the rule, the *force majeure* defense would still fail to rescue the City's permit argument. The *force majeure* defense only excuses permit violations caused solely by acts of God, which is not the case for the Channel erosion. Even before the 2015 floods, the Channel was eroding at a rate that Mr. Kelly admitted was "very significant and unusually [fast]." (Tr., Dkt. 104, at 69:1–14). The Channel has continued to erode well after the 2015 floods. While the 2015 floods no doubt exacerbated erosion in the Channel, they cannot be said to be the sole cause of the various MS4 permit violations in this case.

Because Kleinman has proven an ongoing discharge of a pollutant from a point source into navigable waters of the United States, and because the City cannot avail itself of the CWA's permit-shield defense, Kleinman has established that the City has violated and continues to violate Section 1311(a) of the CWA.[6] What remains to be determined is the appropriate relief.

---

[6] Kleinman also alleges that construction materials from the City's 2010 project continue to be discharged into the river from the Channel. The evidence does not support Kleinman's burden to prove that allegation. The Court credits Mr.

10

*C. Relief*

For citizen suits brought to enforce Section 1311(a) of the CWA, the CWA requires courts to assess a civil penalty. *See* 33 U.S.C.A. § 1365(a) (directing district courts to apply civil penalties under 33 U.S.C. § 1319(d)); 33 U.S.C.A. § 1319(d) (stating that any person who violates Section 1311 "shall be subject to a civil penalty not to exceed $25,000 per day for each violation"). The CWA also gives district courts the "discretion to determine which form of relief"—including injunctive relief— is best suited "to abate current violations and deter future ones." *Laidlaw*, 528 U.S. at 192. Kleinman seeks an order directing the City to pay civil penalties, (Compl., Dkt. 1, at 4), but has not specified the amount he believes to be appropriate. Kleinman also seeks injunctive relief. (Pl.'s Prop. Find. Fact and Concl. of Law, Dkt. 105, ¶ 14). He asks the Court to enjoin the City from approving a site plan to mitigate erosion from the Channel without first seeking approval from a representative to be designated by Kleinman. (*Id.*). If Kleinman's representative were to not approve the plan, the injunction would require the City to submit its plan to the City's Environmental Review Board, which would make a recommendation to the City of Austin Zoning and Platting Commission. (*Id.*). The Zoning and Platting Commission's decision regarding the plan would be appealable to this Court. (*Id.*). For the reasons discussed below, the Court declines to issue Kleinman's requested injunction and will order the City to pay a nominal civil penalty.

1. Injunctive relief

Although the CWA authorizes a district court to order injunctive relief, the Court retains its traditional discretion over whether and how to grant that relief. *Laidlaw*, 528 U.S. at 192 ("[A] federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law.") (citation omitted); *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311 (1982) (explaining that an "injunction is not a remedy which issues as of course . . . or to restrain an act the injurious

---

Kelly's testimony that construction materials are not currently being discharged because those materials were washed away by the 2015 flood events.

11

consequences of which are merely trifling.") (citation and quotation marks omitted). The party seeking a permanent injunction must establish "(1) success on the merits; (2) that a failure to grant the injunction will result in irreparable injury; (3) that said injury outweighs any damage that the injunction will cause the opposing party; and (4) that the injunction will not disserve the public interest." *Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.*, 824 F.3d 507, 533 (5th Cir. 2016) (quotation marks and citation omitted). Even if a CWA plaintiff establishes a violation, the district court is not obligated to order immediate cessation of all violations and may deny injunctive relief altogether. *Envtl. Conservation Org. v. City of Dallas*, 529 F.3d 519, 530 (5th Cir. 2008).

Kleinman's asserted injury is his displeasure with seeing the sandbar across the river. Of course, a sandbar existed there when Mr. Kleinman moved into his home.[7] There was a sandbar there before the City broke ground on its Channel project. There would still be a sandbar there today even if the City had done nothing at all.

It is true that the City's failed efforts to control erosion in the Channel are partially to blame for the sandbar as it exists today. But it is not clear that the City is even mostly to blame. The City did not build the channel that stopped 1,000 feet short of the river in the 1970s. The City did not create a gully that charted an unstable slope through highly erodible soil. The City did not cause the major flood events in 2015 that pushed the headcutting into the existing channel of Country Club Creek West.

The injunction Kleinman seeks is not warranted by his injury. The City has committed to a $12.5 million dollar project that will substantially reduce erosion in the Channel. That project will be underway imminently and is expected to be completed by the summer of 2020. Kleinman has not persuaded the Court that the project is poorly designed or that an alternative project would better stymie erosion in the Channel. Kleinman has not asked the Court for a remedy that would halt

---

[7] Kleinman bought his home on East Cesar Chavez Boulevard in 2008. (Tr., Dkt. 103, at 25:24–25). Aerial photographs show a visible sandbar at the mouth of the gully that preceded the current Channel as far back as 1997. (Renfro Presentation, Dkt. 102-9, at 16:34 (Pl.'s Ex. P-25))

12

erosion or remove the sandbar. Instead, Kleinman asks the Court to subject itself and the City to the expenses and administrative burdens of Court oversight so that he can have a seat at the table. However, the added benefit of Kleinman's oversight, if any, is not warranted by the costs and burdens of that oversight. Nor are those costs outweighed by the marginal benefit to Kleinman of seeing a smaller sandbar from his backyard.

Moreover, Kleiman's requested injunction is not in the public interest. The purpose of the CWA is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). There is no evidence that the ongoing sedimentary discharge is detrimental to human health. There is unrebutted testimony from an experienced environmental scientist that erosion from the Channel has not negatively affected the river's ecosystem. The harm before this Court, in other words, is personal to Kleinman. The public interest is not served by imposing costly oversight on the Court and on the City solely to vindicate Kleinman's aesthetic concerns. That is especially true when the City is currently undertaking substantial and costly measures to address the ongoing discharge. For all of these reasons, the Court finds that injunctive relief is unwarranted.

## 2. Civil penalties

Although the CWA requires the assessment of a civil penalty upon finding a violation of Section 1311, a district court's calculation of the appropriate penalty is highly discretionary. *Tull v. United States*, 481 U.S. 412, 427 (1987). In determining the appropriate civil penalty, the CWA directs district courts to consider six factors: "[1] the seriousness of the violation or violations, [2] the economic benefit (if any) resulting from the violation, [3] any history of such violations, [4] any good-faith efforts to comply with the applicable requirements, [5] the economic impact of the penalty on the violator, and [6] such other matters as justice may require." 33 U.S.C.A. § 1319(d).

The CWA does not prescribe a specific method for calculating an appropriate civil penalty. *U.S. ex rel. Adm'r of E.P.A. v. CITGO Petroleum Corp.*, 723 F.3d 547, 552 (5th Cir. 2013). Some courts use a "top down" approach in which the court first calculates the maximum penalty and then reduces it according to the Section 1319(d) mitigating factors. *Id.* (citing *United States v. Allegheny Ludlum Corp.*, 366 F.3d 164, 178 n.6 (3d Cir. 2004)). Other courts, meanwhile, employ a "bottom up" approach in which they first calculate the economic benefit resulting from the violation and then use the remaining Section 1319(d) factors to adjust the figure upward or downward. *Id.* The Fifth Circuit has not held that district courts must follow a particular approach. *Id.*

The top-down approach is unsuited to this case. The maximum penalty is calculated according to the number of days on which a violation occurred. Here, it is clear that erosion does not constantly occur but that it can occur even during minor rain events. There is no evidence, however, of the number of days on which rain caused a sedimentary discharge since the City began its work on the Channel in 2010. Moreover, it is unlikely that satisfactory evidence could be produced to establish the number of days on which sediment has been discharged into the river. Being unable to accurately determine the maximum available penalty, the Court opts to use the bottom-up approach.

Because the precise economic benefit to a violator may be difficult to prove, a court needs only to make a reasonable approximation. *Cedar Point Oil*, 73 F.3d at 576 (citing *Pub. Interest Research Grp. of New Jersey, Inc. v. Powell Duffryn Terminals Inc.*, 913 F.2d 64, 80 (3d Cir. 1990)). The purpose of determining the economic benefit of the illegal discharge to the violator is to "recoup any benefit gained by the polluter," *CITGO Petroleum*, 723 F.3d at 552, so that a violator will not "profit[ ] from its wrongdoing." *Allegheny Ludlum*, 366 F.3d at 177–78. There is no one method for calculating economic benefit, but the Fifth Circuit has approved of an estimate based on the costs a violator would have needed to spend to avoid the illegal discharges. *See Cedar Point Oil*, 72 F.3d at 574–76

14

(approving of a calculation based on the per-barrel cost of pumping produced water into a reinjection well); *see also Allegheny Ludlum*, 366 F.3d at 178 ("The economic benefit calculation starts with the costs spent[,] or that should have been spent, to achieve compliance.").

The cost of the City's current project provides the Court with a reasonable approximation of the cost to mitigate sedimentary erosion in the Channel: $12.5 million. As noted above, however, that figure is only the Court's starting point.

First, the Court must consider the seriousness of the violation. "The seriousness of the violation deals with the negative impact a defendant's actions have on the environment." *United States v. Smith*, No. CIV.A. 12-00498-KD-C, 2014 WL 3687223, at *12 (S.D. Ala. July 24, 2014) (considering also the volume of violations, how far the discharges exceeded the permit's allowances, and other factors). As discussed above, the evidence before the Court establishes that the sedimentary discharges have had no detrimental effect on human health or the environment. And although the erosion has been ongoing for over half a decade since the City first began work on the Channel, the ongoing discharge is of the same sorts of nontoxic sediment that were being deposited at the mouth of the gully before the City ever began its work on the Channel.

Second, the Court must consider the City's history of violations. The Court has received no evidence that the City has any history of causing or exacerbating sedimentary erosion into navigable waters. The Court has likewise received no evidence that the City has a history of CWA violations at all, serious or otherwise.

Third, the Court must consider the City's good-faith efforts to comply with the CWA. Good faith efforts may include inadequate efforts to comply or the hiring of a consultant to help a violator achieve compliance. *Smith*, 2014 WL 3687223, at *14. The City hired a consultant to plan its 2010 work on the Channel and then spent over $1 million improving the Channel. The City hired another consultant to plan its current $12.5 million project. Although the City's efforts to date have not been

15

successful, its past efforts and its future plans demonstrate its good faith in reducing the ongoing sedimentary discharges from the Channel.

Fourth, the Court must consider the economic impact that a civil penalty would have on the violator. In order to mitigate in favor of a reduced penalty, the economic impact of the full penalty must be "ruinous or otherwise disabling." *Smith*, 2014 WL 3687223, at *15 (citation omitted). Although $12.5 million is not an insignificant sum, it cannot be said to be a ruinous or disabling amount given the City's tax base and overall budget.

Finally, the Court may consider other matters as justice requires. Several considerations are relevant here. For one thing, any civil penalty levied on the City will be paid by local taxpayers rather than by the people responsible for the discharges. For another, a civil penalty does not serve the same purpose for a state actor as it does a private business. Because the City has no profit motive to exacerbate the erosion in the Channel, a civil penalty does not serve to disincentivize illegal but profitable pollution. And lastly, as the Court has previously discussed, the City does not bear sole responsibility for the ongoing discharges.

Together, these factors counsel in favor of a nominal penalty. The Court will enter a separate order requiring the City to pay a civil penalty of $25,000.

## CONCLUSION

For the reasons stated, the Court finds that the City violated the CWA and finds it liable under 33 U.S.C. § 1311(a). The Court will enter judgment in a separate order.

**SIGNED** on March 6, 2018.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE